FILED
Feb 26, 2024
10:41 AM(CT)
TENNESSEE
WORKERS' COMPENSATION
APPEALS BOARD



# TENNESSEE BUREAU OF WORKERS' COMPENSATION
# WORKERS' COMPENSATION APPEALS BOARD

| | |
|---|---|
| Andrew Kelley | )   Docket No.     2023-06-1638 |
| | ) |
| v. | )   State File No.   94578-2021 |
| | ) |
| Express Services, Inc., et al. | ) |
| | ) |
| | ) |
| Appeal from the Court of Workers' | ) |
| Compensation Claims | ) |
| Joshua D. Baker, Judge | ) |

## Affirmed and Remanded

In this interlocutory appeal, the employer challenges the trial court's determination that the employee will likely prevail at a hearing on the merits in establishing the compensability of his right hip injury and that he is entitled to medical benefits. The employee reported sustaining an injury to his right hip while working for a temporary employment agency at a factory. The employer initially accepted the claim and provided medical benefits. After initial discovery, the employer contended the employee's current condition and need for surgery were related to his pre-existing hip condition and that he did not suffer an injury arising primarily out of the employment. After an expedited hearing, the trial court concluded the employee would likely prevail at trial and ordered the employer to authorize the surgery recommended by the authorized physician. The employer has appealed. Having carefully reviewed the record, we affirm the trial court's order and remand the case.

Judge Pele I. Godkin delivered the opinion of the Appeals Board in which Presiding Judge Timothy W. Conner and Judge Meredith B. Weaver joined.

Gregory H. Fuller and Houston M. Gunn, Knoxville, Tennessee, for the employer-appellant, Express Services, Inc.

Jeffrey P. Boyd, Jackson, Tennessee, for the employee-appellee, Andrew Kelley

## Factual and Procedural Background

Andrew Kelley ("Employee"), a 21-year-old resident of Dickson County, Tennessee, reported suffering an injury to his right hip on December 16, 2021, while working at Tennsco, where he had been placed by Express Services, Inc. ("Employer"), a

1

temporary employment agency. He described standing up from a squatting position while lifting four I-beams to move them to the next stage of the manufacturing process when the beams caught on a rack, becoming stuck for a moment. When that happened, Employee felt a pop in his right hip. He reported the incident immediately and was seen by a physician's assistant at OrthoGo the same day.

Employee had previously undergone bilateral hip arthroscopies to repair labral tears in the hips. Employee does not dispute that he is genetically predisposed to hip problems. Dr. Chad Price performed a left hip arthroscopy on Employee in 2018 when Employee was fifteen. Employee began having similar problems in his right hip and had an arthroscopy to repair a labral tear in the right hip in March 2019. On July 15, 2019, over two years before the work incident, Dr. Price observed that Employee felt he was doing well, had completed physical therapy, and had full range of motion and strength in his right hip. Dr. Price released Employee to full activity and instructed him to return if needed.

Employee returned to Dr. Price on March 9, 2020 and reported a "tearing feeling" in his right hip "while doing core exercises." Employee reported that he had been doing the same exercises consistently with no complaints. Dr. Price felt that the pain Employee was experiencing was likely inflammation in the hip joint and noted it was "unlikely that he has retorn his labrum." He recommended conservative treatment.

Employee returned to Dr. Price in April, and then again on May 11, 2020. At that final appointment, Employee reported his hip continued to be sore after prolonged use and that it was painful after jogging, although he could walk "a number of miles" with no problem. On exam, he had full strength and range of motion in the right hip. Dr. Price stated he was "pleased with his progress in this regard. . . . I explained to him and his mother that his hip has recovered very well and I am not concerned that he has re-injured this." He instructed Employee to return as needed.

After the work incident, the December 16, 2021 note from OrthoGo reflects that Employee reported right hip pain after squatting and lifting something at work and feeling a popping sensation in his hip. The note reflected a prior history of left hip impingement but made no note of Employee's previous right hip problems. Employee was diagnosed with right hip pain, and the provider ordered an MRI arthrogram to rule out a labral tear of the right hip.

Employee followed up at OrthoGo on January 18, 2022, and an MRI arthrogram showed normal bone and joint anatomy but did not reveal a labral tear. He was diagnosed with a right hip sprain, and the provider opined that the condition should resolve with time. Employee returned to OrthoGo on February 10, 2022 with continued complaints of right hip pain. Employee reported that he believed he may have a labral tear in the right hip based on his prior experiences. He requested and received a referral to Dr. Price, the physician who had treated him previously for bilateral hip problems.

2

Instead of authorizing the referral to Dr. Price, Employer offered Employee a panel of specialists on which Dr. Price was not included. Employee selected Dr. J.W. Thomas Byrd with Tennessee Orthopaedic Alliance, who first saw Employee on April 7, 2022. Dr. Byrd's note reflects Employee was there for hip pain and that he had a history of bilateral hip arthroscopies.[1] Dr. Byrd noted that Employee's recovery from his right hip arthroscopy in 2019 was slower than his recovery for his left hip but that Employee had returned to full activity and was not experiencing problems in his right hip at the time of the work incident. Dr. Byrd recommended an intra-articular injection for diagnostic purposes and to, hopefully, provide pain relief. He noted that if Employee's condition did not improve, he may request a "conventional MRI without contrast since the contrast can obscure some of the issues going on in and around the hip."[2]

At Employee's next visit in July, Dr. Byrd noted that Employee experienced significant therapeutic benefit from the injection for approximately four weeks. Dr. Byrd also noted that Employee's complaints were persisting six months after the injury and that the previous MRI performed with contrast showed what Dr. Byrd would interpret as expected post-surgical changes. He stated, however, that "ultimately we know there could be much more going on in his joint" than the MRI revealed. Because of Employee's school schedule, Dr. Byrd recommended Employee continue the exercise regimen he had begun in physical therapy and suggested obtaining a conventional MRI when Employee was home for fall break.

Employee proceeded with an MRI on October 18, 2022, and then followed up with Dr. Byrd on November 21. The MRI revealed some changes that could reflect a "[p]ossible small right superior acetabular labral tear." Dr. Byrd noted that Employee had exhausted the options for conservative care and that a repeat arthroscopy was warranted. He noted that Employee continued to report hip symptoms, and "[h]is hip being [a] significant problem is supported by his response to the intraarticular injection last summer."

Upon receiving the surgical recommendation, Employer declined to authorize the surgery, asserting Employee's need for this procedure was due to his preexisting condition.

---

[1] Although Dr. Byrd's note first indicated Employee was there for a consult on his *left* hip, it appears that is a typographical error, as all subsequent references to Employee's complaints in Dr. Byrd's records reflect *right* hip problems.

[2] An MRI arthrogram is "a diagnostic procedure that combines magnetic resonance imaging (MRI) with the injection of a contrast agent into a joint. This technique allows for enhanced visualization of the joint structures, such as ligaments, tendons, and cartilage, to help diagnose various joint abnormalities and injuries." "MR Arthrography," *Clinical Definitions Library*, Yale Medicine, https://www.yalemedicine .org/clinical-keywords/mr-arthography (last visited Feb. 20, 2024). An "MRI with contrast" uses "a contrast material, typically gadolinium, . . . injected through an intravenous (IV) line into a vein in a hand or arm. The contrast material helps make certain details clearer." "MRI," *Patient Care and Health Information – Tests and Procedures*, Mayo Clinic, https://www.mayoclinic.org/tests-procedures/mri/ about/pac-20384768 (last visited Feb. 20, 2024).

Employer submitted the request to utilization review ("UR"), which recommended that the treatment not be authorized.[3] Employee appealed the UR decision to the Bureau of Workers' Compensation's Medical Director, who reversed the denial on the basis of medical necessity, noting "[t]he history and diagnostics support [Dr. Byrd's] request." Employer had also requested that Employee attend an examination with a physician of Employer's choosing. Employee, through counsel, refused, and Employer filed a petition for benefit determination on March 3, 2023, seeking to compel Employee to attend the requested medical examination. Employee objected, arguing the request was not reasonable under Tennessee Code Annotated section 50-6-204(d)(1). The trial court disagreed and ordered Employee to attend the examination Employer scheduled with its selected physician, Dr. Michael Calfee.

Dr. Calfee completed his evaluation of Employee on May 23, 2023. In his report, Dr. Calfee reviewed Employee's medical history and the history of his current complaints. He agreed with Dr. Byrd's treatment recommendation but opined that the December 16, 2021 incident at work was not more than fifty percent the cause of Employee's current complaints or need for treatment. In his report, he stated as follows:

> I do think looking at the preponderance of all the evidence that it is greater than 50% likely that his current condition is not caused by his employment. I say this with a degree of medical certainty. In March of 2020, he did feel a "tear" sensation while weightlifting. This is very similar to the description of the work injury described in December of 2021. He continued to have increased pain and weakness for several months. Dr. Price documented continued right hip pain and fatigue with prolonged use at his 5/11/2020 visit. There is no follow up with Dr. Price after this. There is no medical documentation that his right hip was asymptomatic prior to his 12/16/21 injury. His repeat MRI of his right hip was relatively normal. In all of Dr. Byrd's progress notes, the Assessment is Pain in right hip. There is no medical evidence to support a worsening of pre-existing condition other than increased pain. I think it is more likely than not that his current condition is related to his pre-existing condition. I say this with a degree of medical certainty.

After receiving Dr. Calfee's report, Employer continued to deny the surgery request; as a result, Employee filed a motion to compel the treatment recommended by Dr. Byrd. The court referred the case for mandatory mediation, which was ultimately unsuccessful. A dispute certification notice was filed listing the disputed issues as compensability, medical benefits, and temporary disability benefits. Employer indicated it was defending

---

[3] Employee obtained legal representation after the recommended surgery was denied by Employer's utilization review provider.

the claim on the basis that the injury did not arise primarily out of or in the course and scope of the employment.

On October 12, 2023, Employer requested a continuance of the hearing, asserting it wanted to take Dr. Price's deposition. Employee objected, and the trial court denied Employer's motion, noting Employer had already obtained Dr. Price's opinions in his responses to a questionnaire and that Employer had ample opportunity to take Dr. Price's deposition prior to scheduling the expedited hearing. That order was not appealed.

After an expedited hearing, the trial court entered an order compelling Employer to authorize and pay for the surgery recommended by Dr. Byrd. In doing so, it found that, as the authorized physician, Dr. Byrd's causation opinion was entitled to a presumption of correctness that had not been rebutted by Employer's proof. Employer has appealed.

## Standard of Review

The standard we apply in reviewing a trial court's decision presumes that the court's factual findings are correct unless the preponderance of the evidence is otherwise. *See* Tenn. Code Ann. § 50-6-239(c)(7) (2023). When the trial judge has had the opportunity to observe a witness's demeanor and to hear in-court testimony, we give considerable deference to factual findings made by the trial court. *Madden v. Holland Grp. of Tenn., Inc.*, 277 S.W.3d 896, 898 (Tenn. 2009). However, "[n]o similar deference need be afforded the trial court's findings based upon documentary evidence." *Goodman v. Schwarz Paper Co.*, No. W2016-02594-SC-R3-WC, 2018 Tenn. LEXIS 8, at *6 (Tenn. Workers' Comp. Panel Jan. 18, 2018). Similarly, the interpretation and application of statutes and regulations are questions of law that are reviewed *de novo* with no presumption of correctness afforded the trial court's conclusions. *See Mansell v. Bridgestone Firestone N. Am. Tire, LLC*, 417 S.W.3d 393, 399 (Tenn. 2013). We are also mindful of our obligation to construe the workers' compensation statutes "fairly, impartially, and in accordance with basic principles of statutory construction" and in a way that does not favor either the employee or the employer. Tenn. Code Ann. § 50-6-116 (2023).

## Analysis

In its notice of appeal, Employer raises three issues: (1) whether the trial court abused its discretion in denying Employer the opportunity to depose Dr. Price; (2) whether the trial court abused its discretion in accepting Dr. Byrd's causation opinion over those of Dr. Calfee and Dr. Price; and (3) whether the trial court erred in finding the evidence sufficient to entitle Employee to workers' compensation benefits when Dr. Byrd has not identified a new distinct injury arising primarily from the work accident.

5

*Pre-Hearing Discovery*

Employer argues the trial court abused its discretion in denying Employer's request for a continuance to take Dr. Price's deposition. Employee responds that the trial court did not abuse its discretion. We conclude, however, it is unnecessary for us to address the issue because it was not timely appealed. The order denying Employer's motion for a continuance was entered on October 27, 2023, and the deadline to appeal that order expired on November 7, 2023. The issue was first raised on appeal in the December 7, 2023 notice of appeal, and, thus, is not timely. *See* Tenn. Comp. R. & Regs. 0800-02-22-.01(3) (2023); *see also Bates v. Command Ctr., Inc.*, No. 2014-06-0053, 2015 TN Wrk. Comp. App. Bd. LEXIS 10, at *5 (Tenn. Workers' Comp. App. Bd. Apr. 2, 2015) ("Appellate courts treat the untimely filing of a notice of appeal in civil cases as a jurisdictional defect, resulting in a dismissal of the appeal."). Accordingly, we conclude the issue was waived.

*Weighing of Medical Opinions*

Employer next argues that the trial court abused its discretion in accepting Dr. Byrd's opinion over that of Drs. Calfee and Price. In considering conflicting expert medical opinions, a court may consider "the qualification of the experts, the circumstances of their examination, the information available to them, and the evaluation of the importance of that information by other experts." *Orman v. Williams Sonoma, Inc.*, 803 S.W.2d 672 (Tenn. 1991). In addition, it is well-established that, when faced with competing expert medical opinions, "trial courts are granted broad discretion in choosing which opinion to accept, and we will not disturb that decision absent an abuse of discretion." *Jimenez v. Xclusive Staffing of Tenn., LLC*, No. 2016-06-2377, 2017 TN Wrk. Comp. App. Bd. LEXIS 45, at *6 (Tenn. Workers' Comp. App. Bd. Aug. 7, 2017).[4] However, we are also charged with reviewing documentary evidence *de novo*. *See, e.g.*, *Brees v. Escape Day Spa & Salon*, No. 2014-06-0072, 2015 TN Wrk. Comp. App. Bd. LEXIS 5, at *16 (Tenn. Workers' Comp. App. Bd. Mar. 12 2015) ("[T]he trial court occupies no better position than this Appeals Board in reviewing and interpreting documentary evidence."). Further, when the trial court's determination is challenged on appeal, we must determine where the preponderance of the evidence lies. *See* Tenn. Code Ann. § 50-6-239(c)(7). Thus, in considering these various standards of review, we have previously concluded that, in circumstances where a trial court has weighed expert medical opinions contained in depositions, the trial court has discretion to accredit the expert opinion it believes offers the more probable explanation. We then consider whether the preponderance of the evidence as a whole, including lay testimony and other evidence, leads to the conclusion that the trial court abused its discretion. *See Moore v. Beacon*

---

[4] A trial court abuses its discretion when it causes an injustice to the party challenging the decision by (1) applying an incorrect legal standard, (2) reaching an illogical or unreasonable decision, or (3) basing its decision on a clearly erroneous assessment of the evidence. *Konvalinka v. Chattanooga-Hamilton County Hosp. Auth.*, 249 S.W.3d 348, 358 (Tenn. 2008).

*Transport, LLC*, No. 2018-06-1503, 2021 TN Wrk. Comp. App. Bd. LEXIS 39, at *7 n.1 (Tenn. Workers' Comp. App. Bd. Oct. 29, 2021).

First, with respect to Employer's assertion that Dr. Price's opinion is consistent with Dr. Calfee's, we find the issue to be more nuanced than Employer's argument would suggest. Employer obtained Dr. Price's opinions by means of a questionnaire. The following series of questions and responses are of particular relevance to the issue of causation.

Q:     Do you agree with Dr. Calfee that [Employee's] current right hip condition is more likely than not, [sic] related to [Employee's] genetics and anatomy?

A:     I can't answer this. His genetic issue of impingement was the reason for his initial surgery. I can't answer what has happened since I last evaluated him.

Q:     Without a traumatic tear, is [Employee's] current right hip pain and possible right labral tear likely the result of his pre-existing hip condition that you treated [Employee] for?

A:     ["X" placed in the "Yes" blank] assuming [no] injury

Q:     Would you agree that [Employee's] accident and symptoms are consistent with the symptoms [Employee] was experiencing in March of 2020?

A:     I haven't evaluated him since, so I can't say.

Q:     In your expert opinion, given [Employee's] pre-existing hip condition along with the fact that there is no evidence of a traumatic tear and [Employee] was on the job for less than two full days, did [Employee's] accident on December 16, 2021, contribute more than 50% in causing his current right hip condition?

A:     ["X" placed in the "No" blank] Since there was no tear documented on MRI, and he had pain at my last visit, I can't determine that a work injury is >50% involved.

Q:     In your expert opinion, given [Employee] was experiencing pain and fatigue at the end of your treatment for his right hip, did [Employee's] employment on December 16, 2021 contribute more than 50% in aggravating his pre-existing right hip condition?

A: ["X" placed in the "No" blank] I assume from this that his exam and complaints are similar to my last visit with him.

Dr. Price repeatedly qualified his responses, stating that he has not seen Employee since 2020 and does not know what had happened in the interim. Thus, we find Dr. Price's responses to these critical questions equivocal, and we cannot conclude the trial court abused its discretion in discounting his opinions.

Dr. Calfee, on the other hand, was more direct in opining that he did not believe Employee suffered a compensable, work-related accident. Dr. Calfee, in expressing his agreement with Dr. Byrd's diagnosis, noted that labral tears are difficult to discern on MRIs. He agreed with Dr. Byrd's treatment recommendation, noting that Dr. Byrd is a leading worldwide expert in treating labral tears in hips.[5] Dr. Calfee expressed his opinion, however, that the alleged work incident was not more than fifty percent the cause of Employee's current condition and need for treatment, testifying that "[i]n just reviewing the preponderance of the evidence, I felt like he probably had a recurrent – if he has a labral tear, it's probably a recurrent labral tear." In expressing his causation opinion, however, Dr. Calfee relied on his understanding of workers' compensation law, stating that "I feel confident in what I've said that I do not think his – his problem is work compensable." When questioned whether the work injury contributed "more than 50 percent in aggravating [Employee's] prior right hip condition," Dr. Calfee responded, "[T]hat's difficult to say, but I don't think it matters in the – in my understanding. I don't really know how to answer that, to be honest with you."

In contrast, Dr. Byrd was clear and unequivocal in his opinion that Employee's employment is the primary cause of his current condition and need for treatment. When asked whether he had an opinion "as to what caused the need for you to have to perform that right hip surgery," he responded that "the reason for the surgery was based on the persistent pain he was experiencing. And the pain, according to all our records, was caused by the injury that he sustained in December of '21." Counsel for Employer pressed Dr. Byrd on the significance of the MR arthrogram that revealed a normal joint and the later MRI that revealed either a labral tear or postsurgical changes. Dr. Byrd was firm and consistent in his responses that MRIs are of limited use in diagnosing hip pathology because they cannot accurately distinguish between various conditions in the hip. When asked whether the imaging is reflective of postsurgical changes, Dr. Byrd responded as follows:

They're not conclusive one way or the other. . . . And that's the reasoning for the surgery, is 11 months later, he still has pain and has failed all forms of

_____

[5] Dr. Calfee testified that Dr. Byrd is "the man" and "the world's expert" in treating hip conditions, noting "Dr. Byrd is the one they would need to see." Dr. Calfee acknowledged that he has seen and provided a diagnosis for patients with hip conditions, but "I don't treat them . . . I totally defer to Dr. Byrd as far as what needs to be done."

conservative treatment.  And we know the MRIs can underestimate what may be going on inside the hip, so the only thing is arthroscopic surgery.

Dr. Byrd also explained that MRIs performed with contrast dye can "obscure many forms of damage."  Further, when questioned as to whether Employee's pre-existing condition contributed to his current right hip condition, Dr. Byrd opined that it "certainly could have made him more susceptible to a reinjury, but he did have a reinjury."  He also stated that "the reason for the surgery is for the pain and the pain was precipitated by the injury he had at work."

In short, we agree with the trial court's determination that Dr. Price's causation opinions are of limited value given that he repeatedly stated he had not seen Employee in almost four years.  Dr. Calfee's opinion is more direct but is impacted, at least partially, by his hesitation in addressing the compensability of incidents that allegedly aggravate a pre-existing condition.  On the other hand, Dr. Byrd is the authorized physician, and his opinion that Employee's current complaints and need for treatment are primarily caused by the December 16, 2021 work accident is unequivocal.  Further, his opinion is presumed correct, and his medical expertise in this area was acknowledged by Dr. Calfee.  Despite being pressed by Employer on multiple aspects of his causation opinion, he did not waiver and provided clear and detailed explanations to support his opinions.  As such, we conclude the preponderance of the evidence supports the trial court's assessment of the medical proof, and we find no abuse of discretion.

*Proof of an Injury*

Employer's last issue on appeal concerns whether Dr. Byrd sufficiently identified a "new, distinct injury that is separate from [Employee's] preexisting condition."  Employer asserts this case is analogous to *Edwards-Bradford v. Kellogg Co.*, No. W2022-01097-SC-R3-WC, 2023 Tenn. LEXIS 34 (Tenn. Workers' Comp. Panel May 26, 2023), and contends the trial court erred because the medical proof did not show a "discrete injury attributable to the incident" or how the work injury "advanced the preexisting condition or caused a new, distinct injury."

In *Edwards-Bradford*, the employee sought permanent disability benefits for an alleged back injury. *Id.* at *2.  The employee's authorized treating physician, Dr. Fereidoon Parsioon, concluded she had not sustained an acute injury, noting that objective studies revealed only degenerative changes and that there was no anatomical change as a result of the work incident. *Id.* at *4.  Dr. Parsioon provided no work restrictions and assigned a permanent impairment rating of zero. *Id.*  After treatment with Dr. Parsioon ended, the employee began experiencing additional symptoms in her lower back and right leg. *Id.*  She selected another authorized treating physician, Dr. Sam Murrell, who also noted no discrete injury and placed the employee at maximum medical improvement and assigned no permanent impairment or work restrictions. *Id.* at *5.

9

The employee in *Edwards-Bradford* next saw Dr. Apurva Dalal for an independent medical evaluation. *Id.* at *6. Dr. Dalal obtained objective studies which revealed multilevel degenerative disc disease. *Id.* at *7. He testified that the employee had an aggravation of degenerative arthritis due to her work injury and would retain an impairment rating of seven percent to the body as a whole. *Id.* In concluding that the employee was not entitled to permanent disability benefits, the trial court noted that Dr. Dalal did not discuss how the work injury advanced the employee's preexisting injury or caused a new injury; instead, he only testified that the work incident made the employee's preexisting condition symptomatic. *Id.* at *12. As a result, the court determined she had failed to rebut the presumption of correctness afforded to the causation and impairment opinions of her authorized treating physicians. *Id.*

In affirming the trial court, the Supreme Court's Special Workers' Compensation Appeals Panel noted that although Dr. Murrell believed the employee experienced pain following the incident at work, he testified that she did not experience a new and distinct injury related to the work incident. *Id.* at *12. Further, the medical records of Dr. Parsioon were consistent with those of Dr. Murrell, and the opinions of both doctors carried a presumption of correctness. *Id.* Dr. Dalal testified only that the work incident caused the employee's preexisting degenerative condition to become symptomatic. *Id.* at *11. The Appeals Panel explained that an injury is not compensable if it results only in increased pain or other symptoms caused by the underlying condition. The court reasoned that

> the employee does not suffer a compensable injury where the work activity aggravates the pre-existing condition merely by increasing the pain. However, if the work injury advances the severity of the pre-existing condition, or if, as a result of the pre-existing condition, the employee suffers a new, distinct injury other than increased pain, then the work injury is compensable.

*Id.* at *11-12.[6] In considering the medical proof, the Appeals Panel noted that Drs. Parsioon and Murrell did not document findings of positive straight leg tests or weakness in the employee's legs. *Id.* at *12-13. Also, a follow-up MRI did not show any significant anatomic change, and Dr. Murrell testified that the employee's response to treatment, as well as her working seven days per week without restrictions, supported his opinion that there was not a permanent injury related to the work incident. *Id.* at *13. Accordingly, the Appeals Panel concluded the evidence did not preponderate against the trial court's findings. *Id.*

---

[6] We also note, however, that a work-related accident causing an "actual progression or aggravation" of a pre-existing condition that results in "increased pain that is disabling" is compensable. *See, e.g.*, *Blevins v. Southern Champion Tray, LP*, No. 2018-01-0673, 2019 TN Wrk. Comp. App. Bd. LEXIS 29, at *14 (Tenn. Workers' Comp. App. Bd. July 11, 2019).

10

We previously addressed the issue of aggravations in *Miller v. Lowe's Home Centers, Inc.*, No. 2015-05-0168, 2015 TN Wrk. Comp. App. Bd. LEXIS 40 (Tenn. Workers' Comp. App. Bd. Oct. 21, 2015). In *Miller*, the employee fell when he stepped back onto a pallet jack, reporting several injuries, including to his left hip. *Id.* at *2. During diagnostic testing, the physician noted a "severely arthritic left hip" that pre-existed the work accident. *Id.* at *3. The treating physician later testified that the work accident had "exacerbated" the employee's pre-existing hip condition and necessitated the need for surgery. *Id.* On appeal, we affirmed the trial court's order for medical benefits, explaining:

> [T]o qualify for medical benefits at an interlocutory hearing, an injured worker who alleges an aggravation of a preexisting condition must offer evidence that the aggravation arose primarily out of and in the course and scope of employment. Moreover, the employee must come forward with sufficient evidence from which the trial court can determine that the employee would likely establish, to a reasonable degree of medical certainty, that the work accident contributed more than fifty percent in causing the aggravation, considering all causes. Finally, an aggravation or exacerbation need not be permanent for an injured worker to qualify for medical treatment reasonably necessitated by the aggravation.

*Id.* at *18 (internal citations omitted).

We conclude that, in light of Dr. Byrd's testimony and other expert medical proof, the facts of the present case are more closely aligned to *Miller* than to *Edwards-Bradford*. While Dr. Byrd was not able to determine whether there is a new or recurrent labral tear from the imaging studies that have been obtained to date, his testimony was clear that the December 2021 work accident led to persistent pain, which, in turn, caused the need for surgery, and this evidence was sufficient to establish that Employee will likely prevail on this issue at trial. Moreover, when asked on direct examination whether Employee's continued complaints of pain since the reported injury would be suggestive of an anatomic change in his hip, Dr. Byrd responded "yes." When asked on cross examination how, given the inconclusive nature of the MRIs, he could state that there is evidence of an anatomical change in Employee's hip, Dr. Byrd responded that the evidence of injury is the persistent pain that Employee has experienced since the injury. He further testified that MRIs in general have "limited reliability" related to the hip and that they "can underestimate what is going on in the hip." Dr. Byrd also agreed that Employee's prior hip condition could make him more susceptible to reinjury but maintained that "he did have a reinjury."

We agree with the trial court that neither Dr. Price nor Dr. Calfee rebutted Dr. Byrd's testimony that the need for surgery primarily arose from the work accident. Rather, Dr. Price's responses to Employer's questionnaire suggest that he presumed no new injury had occurred as a result of the reported work incident, but he was unable to state whether the work accident caused an aggravation that arose primarily from the work accident. Dr.

11

Calfee did not suggest that there was no injury, only that Employee's condition was not primarily related to the December 16, 2021 work accident. Accordingly, we conclude the trial court did not err in accepting Dr. Byrd's testimony and in ordering the medical treatment as recommended by Dr. Byrd.

## Conclusion

For the foregoing reasons, we affirm the trial court's decision and remand the case. Costs on appeal are taxed to Employer.



# TENNESSEE BUREAU OF WORKERS' COMPENSATION
# WORKERS' COMPENSATION APPEALS BOARD

| | | |
|---|---|---|
| Andrew Kelley | ) | Docket No. 2023-06-1638 |
| | ) | |
| v. | ) | State File No. 94578-2021 |
| | ) | |
| Express Services, Inc., et al. | ) | |
| | ) | |
| | ) | |
| Appeal from the Court of Workers' | ) | |
| Compensation Claims | ) | |
| Joshua D. Baker, Judge | ) | |

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the Appeals Board's decision in the referenced case was sent to the following recipients by the following methods of service on this the 26th day of February, 2024.

| Name | Certified Mail | First Class Mail | Via Fax | Via Email | Sent to: |
|---|---|---|---|---|---|
| Gregory H. Fuller<br>Houston M. Gunn<br>W. Troy Hart | | | | X | ghfuller@mijs.com<br>hmgunn@mijs.com<br>wth@mijs.com<br>inhoward@mijs.com |
| Jeffrey P. Boyd | | | | X | jboyd@borenandboyd.com<br>scallison@borenandboyd.com |
| Joshua D. Baker, Judge | | | | X | Via Electronic Mail |
| Kenneth M. Switzer, Chief Judge | | | | X | Via Electronic Mail |
| Penny Shrum, Clerk, Court of Workers' Compensation Claims | | | | X | penny.patterson-shrum@tn.gov |



Olivia Yearwood
Clerk, Workers' Compensation Appeals Board
220 French Landing Dr., Ste. 1-B
Nashville, TN 37243
Telephone: 615-253-1606
Electronic Mail: WCAppeals.Clerk@tn.gov